**THE RAMIREZ LEGAL GROUP**
April Ramirez, State Bar No. 319760
april@theramirezlegalgroup.com
468 N. Camden Dr., Suite 5555
Beverly Hills, California 90210
Telephone: (800) 411-0428
Facsimile: (424) 401-7375

**THE ALEXANDROFF LAW GROUP**
Nicholas Alexandroff, State Bar No. 309747
nicholas@alglegal.com
16542 Ventura Blvd., Suite 203
Encino, CA 91436
Telephone: (818) 908-8899
Facsimile: (818) 908-8898

Attorneys for Plaintiffss, NICOLAS MARTINEZ
and THEODORE HATLESTAD

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

NICOLAS MARTINEZ, an individual;
THEODORE HATLESTAD, an individual,

      Plaintiffss,

    v.

O'REILLY AUTO ENTERPRISES LLC, a
limited liability company; and DOES 1-30,
inclusive,

      Defendants.

Case No. 1:22-cv-01643-ADA-CDB
Hon. Ana de Alba
Dept. 1

FIRST AMENDED COMPLAINT FOR
DAMAGES FOR:

(1)  DISABILITY DISCRIMINATION IN
     VIOLATION OF FEHA;

(2)  DISABILITY RETALIATION IN
     VIOLATION OF FEHA;

(3)  FAILURE TO DO EVERYTHING
     REASONABLY NECESSARY TO
     PREVENT DISCRIMINATION,
     HARASSMENT AND RETALIATION
     FROM OCCURING IN VIOLATION
     OF FEHA;

(4)  WRONGFUL
     TERMINATION/ADVERSE ACTION
     IN VIOLATION OF PUBLIC POLICY;

(5)  VIOLATION OF BUSINESS AND

1    PROFESSION CODE §17200, ET SEQ.

2    [JURY TRIAL DEMANDED ON ALL
3    ISSUES AND CAUSES OF ACTION]

4

5

6

7

8    **COME NOW** Plaintiffs NICOLAS MARTINEZ ("MARTINEZ" or "Mr. Martinez") and

9    THEODORE HATLESTAD ("HATLESTAD" or "Mr. HATLESTAD") (all collectively

10   "PLAINTIFFS" or "Plaintiffs") for causes of action against defendant O'REILLY AUTO

11   ENTERPRISES LLC ("O'REILLY" or "EMPLOYER"), a limited liability company; and DOES 1

12   through 30, inclusive, (all collectively "DEFENDANTS", "defendants") as follows:

13   The following is pled on information and reasonable belief:

14   <u>**INTRODUCTION**</u>

15   1.      This employment and personal injury action stems from defendants' knowing and

16   willful exposure of Plaintiffs to COVID-19 and their wrongful termination of Plaintiffs in retaliation

17   for his leave of absence due to COVID-19 exposure and perceived and associational disability

18   (COVID-19).

19   <u>**THE PARTIES**</u>

20   2.      Plaintiff NICOLAS MARTINEZ is an individual residing at all relevant times herein

21   mentioned in the County of Kern, State of California. Plaintiffs was employed by O'REILLY and at

22   the time of his termination, was as a retail service specialist.

23   3.      Plaintiff THEODORE HATLESTAD is an individual residing at all relevant times

24   herein mentioned in the County of Kern, State of California. Plaintiffs was employed by O'REILLY

25   and at the time of his termination, was as a retail service specialist.

26   4.      Defendant O'REILLY is a limited liability company formed in the state of Delaware,

27   at all relevant times qualified for business operations in the State of California, and with substantial

28   contacts in the State of California. Its principal address is 233 S. Patterson Ave., Springfield, Missouri

65802.

5.      At all times relevant to this complaint, O'REILLY was Plaintiffs' employer and employed substantially more than 25 employees. O'REILLY operates and owns numerous auto part retail stores throughout the country.

6.      Defendants DOES 1 through 30 are persons or entities whose true names and identities are presently unknown to PLAINTIFFS, and who therefore are sued under fictitious names. PLAINTIFFS is informed and believes and thereon alleges that each of the fictitiously named defendants are responsible in some manner for the injuries and events alleged herein, and are jointly and severally liable to PLAINTIFFS.  PLAINTIFFS will seek leave of court to amend this complaint to state the true names and capacities of such fictitiously named defendants when ascertained.

7.      At all times herein mentioned, DEFENDANTS, and each of them, were members of, and engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

8.      At all times herein mentioned, the acts and omissions of various DEFENDANTS, and each of them, concurred and contributed to the various acts and omissions of each and all of the other DEFENDANTS in proximately causing the injuries and damages to PLAINTIFFS as herein alleged.

9.      At all times herein mentioned, DEFENDANTS, and each of them, ratified each and every act or omission complained of herein.  At all times herein mentioned, DEFENDANTS, and each of them, aided and abetted the acts and omissions of each and all of the other DEFENDANTS in proximately causing the injuries and damages to PLAINTIFFS as alleged herein.

**JURISDICTION AND VENUE**

10.      Venue is proper in the County of Kern pursuant to Code of Civil Procedure section 395(a) because the subject acts and omissions causing PLAINTIFFS's injuries and damages occurred in the County of Kern, State of California, and because defendants GILMORE and VELLIDO reside in the County of Kern, State of California.

11.      The amount of controversy exceeds the jurisdictional minimum of this Court.

12.      Plaintiffs obtained their right to sue letter from the Department of Fair Employment & Housing ("DFEH") on October 22, 2022 and October 24, 2022.

## **GENERAL ALLEGATIONS**

13.     Whenever and wherever reference is made in this complaint to any act by a defendant or Defendants, such allegations and references shall also be deemed to mean the acts or failures to act of each defendant acting individually, jointly and severally.

14.     PLAINTIFFS filed a complaint against Defendant with the Department of Fair Employment and Housing, thereby exhausting the administrative remedies.  Plaintiffs received a letter from the Department of Fair Employment and Housing giving PLAINTIFFS the right to sue Defendant. A Right to Sue Letter has been served on Defendants and is incorporated as though set forth herein.

15.     Austin Gilmore ("GILMORE") is an individual residing at all relevant times herein mentioned in the County of Kern, State of California. At all relevant times mentioned herein, GILMORE was an employee, district manager, and a managing agent for O'REILLY. At all relevant times, GILMORE exercised substantial independent authority and judgment in his corporate decision-making so that his decisions ultimately determined corporate policy.

16.     Jason Vellido ("VELLIDO") is an individual residing at all relevant times herein mentioned in the County of Kern, State of California. At all relevant times mentioned herein, GILMORE was an employee, store manager, and a managing agent for O'REILLY. At all relevant times, GILMORE exercised substantial independent authority and judgment in his corporate decision-making so that his decisions ultimately determined corporate policy.

17.     PLAINTIFF MARTINEZ started working for EMPLOYER in or around July 2016.

18.     Approximately 10/01/21 – 11/16/2021: The store Mr. Martinez works at has difficulties—no to little management; short-staffed; tired, overworked employees. During this time, Mr. Martinez works a lot of overtime—double shifts and 6 or 7 days per week.

19.     10/11/2021: Mr. Martinez, feeling COVID-like symptoms, calls the company's COVID hotline. He is told by hotline worker to stay home for a number of days. Assistant manager, Savanah, tells Mr. Martinez that he should bypass this by calling the hotline again and telling them he feels fine. Mr. Martinez stays home as ordered.

20.     Approximately 10/16/2021 – 11/01/2021: Employees Theodore HATLESTAD and

Frank Sickler show obvious symptoms of COVID-19 (coughing, fatigue, body aches, sweating, and fever). There is a lack of staff. District manager, GILMORE, store manager VELLIDO, and later his replacement, Tim, are all aware but refuse to send any sick employees home. Employee Theodore HATLESTAD tells VELLIDO that he does not feel well and is experiencing COVID-19 symptoms. VELLIDO indicates to Mr. Hatelstad that he should come into work anyhow because the store is short-staffed. Employees, including Plaintiffs, Theodore HATLESTAD, and Frank Sickler, fear losing their jobs or having other adverse actions taken against them for calling in sick or going home early.

21.     Approximately 10/30/2021: VELLIDO'S last day at the subject store as store manager. VELLIDO was demoted and transferred to another store.

22.     Approximately 10/31/2021 – 11/01/2021: Subject store is without store manager.

23.     11/01/2021: GILMORE is at the subject store for a few hours. Theodore HATLESTAD and Frank Sickler are also present that day at the same time GILMORE is there. Mr. HATLESTAD and Mr. Sickler continue showing obvious COVID-19 symptoms, which GILMORE ignores. GILMORE does not send the symptomatic employees home.

24.     11/02/2021: After working in the back of the store most of the day, Mr. Martinez goes to the front of the store to help the staff with customers. He notices that Mr. HATLESTAD and Mr. Sickler are very ill, and subsequently approaches the new store manager, Tim, to tell him that these two employees are very sick and that they are displaying COVID-19 symptoms such as coughing, body aches, sweating, and fever. Tim's dismissive response is, "it happens to all of us, they're just gonna have to push through it" and then proceeds to walk away. A short time later, Mr. Martinez notices that Mr. Sicker is too sick to stand up and has to go to the back of the store to sit down. After seeing this, Mr. Martinez once again approaches Tim about his coworker's condition. Tim once again dismisses Mr. Martinez's concerns and refuses to send either of the two ill employees home. Tim also refuses to stay and cover for either employee. Mr. Martinez, fearing for Mr. Sickler's health, agrees to stay and work another double shift. Despite knowing that Mr. Sickler and Mr. HATLESTAD are very ill and showing COVID-19 symptoms, store manager Tim selfishly goes home leaving Mr. Martinez and Mr. Hatelstad, who is visibly very ill, to close the store.

25.    That same night, Mr. Sickler texts Mr. Martinez to let him know he had gone to the emergency room and tested positive for COVID. Mr. Martinez then texts Tim and Mr. Hatelstad to let them know about Mr. Sickler testing positive for COVID. Tim never responds.

26.    11/03/2021: The next morning, Mr. Martinez feels a slight tickle in his throat and some fatigue which he believes might be due to working six days and several double shifts in the last seven days, including a double-shift the day/night before. Also, fearing for his job if he did not come in to work (due to the culture created by O'Reilly's managers and assistant managers), Mr. Martinez comes in to work the next morning as scheduled. That morning, in addition to Tim, GILMORE is also at the store. Mr. Martinez learns that no one sanitized the store prior to opening despite Tim being aware that Mr. Sickler had worked and tested positive for COVID-19 the night before.

27.    Shortly before his lunch break, Mr. Martinez begins to feel sick. Consequently, Mr. Martinez approaches GILMORE and asks if he can go take a COVID test during his lunch break. GILMORE responds by telling Mr. Martinez to go home and call the O'REILLY'S COVID hotline. The O'REILLY'S COVID hotline was ran by O'REILLY'S employees operating as local health officers who had jurisdiction over the workplace (O'REILLY'S).  Mr. Martinez leaves the store and calls the COVID hotline. The hotline worker orders him to stay home for 14 days.

28.    11/03/2021 – 11/15/2021: Mr. Martinez stays home to quarantine as ordered by O'REILLY'S, Cal/OSHA, the State Department of Public Health, and the federal Centers for Disease Control and Prevention at the time.

29.    11/04/2021: Mr. Martinez receives his COVID test result, which is negative.

30.    11/16/2021: Mr. Martinez returns to work at the subject store. GILMORE tells Mr. Martinez that for the store's records regarding COVID sick pay, he must write a statement. GILMORE assures Mr. Martinez that this is procedural for the store's records only and it will not adversely affect Mr. Martinez's employment. GILMORE proceeds to tell Mr. Martinez what to write.

31.    Feeling suspicious about the statement GILMORE had him write, Mr. Martinez asks Tim if his job is in jeopardy. Tim assures him that it is not and asks him to stay an extra hour to close the store that night.

32.    11/17/2021: Mr. Martinez comes in for his scheduled shift. Tim pulls him into the office and tells him he is terminated.

33.    MARTINEZ has not been reinstated or rehired by EMPLOYER.

34.    EMPLOYER took adverse employment actions against MARTINEZ, including termination, due to (1) his perceived and associational disability; and (2) exercising his right to reasonable accommodations.

35.    At all relevant times, MARTINEZ was a protected class member as he was perceived by Defendants to have a disability (COVID-19).

36.    MARTINEZ was associated with protected group members, his coworkers Theodore HATLESTAD and Frank Sickler, based upon their disability, COVID-19.

37.    At all relevant times mentioned in this complaint MARTINEZ performed his job for EMPLOYER in a satisfactory and competent manner.

38.    PLAINTIFF HATLESTAD started working for EMPLOYER in or around October 2020 at EMPLOYER'S store located at 104 Roberts Lane, Bakersfield, CA 93308. Mr. Hatlestad is diabetic and considered to be part of a high-risk population for COVID-19. Store manager, VELLIDO, not only knew about this, but being diabetic himself, often had conversations with Mr. Hatlestad about their health.

39.    July 2021: For several months, as part of COVID prevention protocol, all store employees were to have their temperatures taken at the beginning of their shifts and the information was to be recorded on a COVID data sheet along with each employee's initial. This was almost never done at the subject store. District manager, GILMORE, is to visit the subject store for evaluation in July 2021. The night before GILMORE'S visit, store manager, VELLIDO, orders Mr. Hatlestad to falsify the COVID data sheets to make it appear as if though the store's employees were having their temperatures taken as required on a daily basis. VELLIDO also orders Mr. Hatlestad to forge employee initials.

40.      ~10/01/21 – 11/16/2021: Subject store has difficulties—no to little management, short-staffed, and tired, overworked employees. During this time, Mr. Hatlestad works a lot of overtime—double shifts and 6 or 7 days per week. During at least this time, employees are discouraged from calling in sick and have to work alongside sick, COVID-19 symptomatic co-workers.

41.      ~10/14/2021: Store employee, Amber, gives resignation notice.

42.      10/16/2021: Mr. Hatlestad calls VELLIDO and tells him he feels ill and not well enough to come to work. Jason discourages him from staying home and reminds Mr. Hatlestad that they are short-staffed. Not wanting to be retaliated against or leave his team in a bad position, Mr. Hatlestad comes in to work.

43.      10/17/2021 – 10/21/2021: Despite being severely short-staffed, VELLIDO goes on vacation leaving the subject store even more understaffed and his already overworked and fatigued employees left to cover for him.

44.      10/24/2021: Assistant manager, Savannah, resigns.

45.      ~10/25/2021: Closing manager, Izec, goes on COVID sick leave. Mr.  Hatlestad and Frank Sickler are the only employees who can work closing shifts.

46.      10/29/2021 – 11/01/2021: Mr. Hatlestad is feeling overworked and fatigued. He feels worse as time progresses but does not call in sick for fear of retaliation as the store is so short-staffed and would most likely have to close down for business if he missed work. During this same time, Frank Sickler is in very bad shape and showing obvious symptoms of COVID-19 (coughing, fatigue, body aches, sweating, and fever). Mr. Hatlestad is made to close the store with Frank every night and is in close contact with him.

47.      Employees Theodore Hatlestad and Frank Sickler outwardly show symptoms of COVID-19 and are obviously ill. District manager, GILMORE, store manager VELLIDO, and later his replacement, Tim, are all aware but refuse to send any sick employees home. Employees, including Mr. Hatlestad, fear losing their jobs or having other adverse actions taken against them for calling in sick or going home early.

///

48.   ~10/30/2021: VELLIDO'S last day at the subject store as store manager. VELLIDO has been demoted and is to transfer to another store.

49.   10/31/2021 – 11/01/2021: Subject store is without store manager.

50.   11/01/2021: GILMORE, district manager, is at the subject store for a few hours. Mr. Hatlestad and Frank Sickler are also present that day at the same time GILMORE is there and both show COVID symptoms.

51.   11/02/2021: After working in the back of the store most of the day, Mr. Martinez goes to the front of the store to help the staff with customers. He notices that Mr. Hatlestad and Frank Sickler are very ill and subsequently approaches the store manager, Tim, to tell him that these two employees are very sick and are displaying COVID-19 symptoms such as coughing, body aches, sweating, and fever. Mr. Martinez asks Tim to allow them to go home. This was the third day in a row that employee, Frank Sickler, had shown up to work with severe COVID symptoms. Tim refuses to let either employee go home and his dismissive response is "it happens to all of us, they're just gonna have to push through it" and proceeds to walk away.

52.   Hearing what Tim had to say, Mr. Hatlestad continues to "push through" his shift. Frank is too sick to stand up and has to go to the back of the store and sit down often. After seeing this, Mr. Martinez once again approaches Tim about his coworkers' condition. Tim once again dismisses Mr. Martinez's concerns and refuses to send either of the two ill employees home. Tim refuses to stay and cover for either employee. Mr. Martinez, fearing for Frank's health, agrees to stay and work another double shift. Despite knowing that Mr. Sickler and Mr. Hatlestad are very ill and showing COVID-19 symptoms, Tim selfishly goes home leaving Mr. Martinez and Mr. Hatlestad to close the store.

53.   Later that night, Mr. Martinez texts Mr. Hatlestad to let him know that Mr. Sickler had just been discharged from the hospital and tested positive for COVID-19. Mr. Martinez recommends to Mr. Hatlestad that he should also get tested for COVID and Mr. Hatlestad agrees.

54.   That same night, Mr. Martinez also texts Tim to let him know that Mr. Sickler tested positive for COVID. Tim never responds.

///

55. 11/03/2021: Mr. Hatlestad calls in sick to the store first thing in the morning. Tim gives Mr. Hatlestad the number to the O'REILLY COVID line. Prior to this, Mr. Hatlestad didn't know that any such number/line existed—he had never been told to call this line if he was feeling sick. Mr. Hatlestad gets tested for COVID.

56. 11/04/2021: Mr. Hatlestad receives positive COVID test result from his doctor. Mr. Hatlestad relays this information to the COVID hotline and he is ordered to stay home on COVID leave, which he does.

57. 11/04/2021 – 11/12/2021: Mr. Hatlestad is on COVID-19 sick leave. During this time, newly re-hired assistant manager, Savannah, harasses him by texting on several occasions to see if he can come back and work. Mr. Hatlestad, still not feeling well, responds that he is still sick.

58. 11/05/2021: Izec returns to work from COVID sick leave.

59. ~11/08/2021: Amber withdraws her resignation notice and stays to work at the subject store.

60. 11/13/2021: Mr. Hatlestad returns to work.

61. 11/16/2021: GILMORE asks Mr. Hatlestad why he came in to work on 11/02/2021 feeling ill. Mr. Hatlestad responds that he feared retaliation as the store would have had to close down.

62. A short while later, GILMORE calls Mr. Hatlestad back into the office and terminates him for working while sick.

63. 11/17/2021: Mr. Hatlestad writes a letter appealing his termination.

64. 11/18/2021: Mr. Hatlestad writes a supplemental letter for his appeal.

65. 11/29/2021: O'REILLY'S denies Mr. Hatlestad's appeal.

66. PLAINTIFF HATLESTAD has not been reinstated or rehired by EMPLOYER.

67. EMPLOYER took adverse employment actions against PLAINTIFF HATLESTAD, including termination, due to (1) his disability; and (2) use of reasonable accommodations.

68. At all relevant times, PLAINTIFF HATLESTAD was a protected class member as he was perceived by Defendants to have disabilities—COVID-19 and diabetes.

69. At all relevant times mentioned in this complaint PLAINTIFF HATLESTAD

performed his job for EMPLOYER in a satisfactory and competent manner.

70.    The damages sought by Plaintiffs in this action far exceed the minimum jurisdictional amount of this court so that court has jurisdiction of this matter. Plaintiffs has sustained general and special damages within the jurisdictional limits of this Court.

71.    Plaintiffs is informed and believes and, on that basis, alleges, DEFENDANTS engaged, continue to engage, and will continue to engage in the foregoing conduct set forth in this complaint unless they are restrained from so doing.  Defendants' conduct has injured Plaintiffs as well as others and will continue to cause irreparable injury to Plaintiffs and others, who have no adequate remedy at law.  Relief by damages alone for Defendants' continuing conduct would require a multiplicity of suits.  Accordingly, Plaintiffs is also entitled to injunctive and declaratory relief including declaratory relief that there were violations of FEHA, public policy and the law by DEFENDANTS.

72.    Plaintiffs seek damages, attorney fees, costs, injunctive, declaratory relief and any other remedies he is entitled to under the law pursuant to the claims alleged in this complaint.

73.    The conduct which Plaintiffs complains of in this complaint, and which is alleged below, was carried out by all DEFENDANTS willfully, intentionally, and with oppression, malice and fraud and was carried out with conscious disregard of Plaintiffs' rights as guaranteed by the state law pursuant to which Plaintiffs is entitled to an award of exemplary damages according to proof.

74.    Plaintiffs had to employ an attorney to prosecute this action and have thereby incurred costs and attorney fees.  Such attorneys' fees and costs are necessary for the prosecution of this action for which Plaintiffs is entitled to an award of attorneys' fees and costs in an amount according to proof.

## **FIRST CAUSE OF ACTION**

### DISABILITY DISCRIMINATION IN VIOLATION OF FEHA

By Plaintiffs against EMPLOYER and DOES 1-30

75.    Plaintiffs incorporate herein by reference and re-allege each and every paragraph in this Complaint as though duly set forth in full herein.

76.    EMPLOYER employed at least five employees during all relevant time periods of Plaintiffs' employment.

77.    Plaintiffs were, at all times material hereto, disabled employees (and one who engaged in legally protected conduct) and within a protected class covered by Cal. Gov. Code § 12940.

78.    Under FEHA, it is an unlawful employment practice for an employer because of a person's actual or perceived disability or because of a person's association with another person who is a disabled, seeks accommodation, opposes practices forbidden by FEHA or otherwise protected under FEHA or public policy, to refuse to hire or employ the person, to refuse to select the person for a training program leading to employment, to bar or discharge/terminate the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.  It is unlawful under FEHA for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under FEHA, or to attempt to do so.  It is unlawful, under FEHA, for an employer to fail to take all reasonable steps necessary to prevent discrimination and harassment based on an employee's perceived or actual association with another person who is a disabled, seeks accommodation, opposes practices forbidden by FEHA otherwise protected under FEHA or public policy.

79.    Under FEHA, it is an unlawful employment practice for an employer to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under FEHA or because the person has filed a complaint, testified or assisted in any proceedings under FEHA.  This includes opposing practices on behalf of themselves, others they are associated with or based on the protected status of others.

80.    Under FEHA it is a protected activity to oppose practices forbidden by FEHA, to file and/or make a complaint with The Department of Fair Employment and Housing, participate or assist in any proceeding regarding and/or in support of a FEHA complaint or violation, assert rights pursuant to FEHA, assist in or participate in investigating unlawful discrimination and harassment, complain about, and/or report, unlawful discrimination, harassment and/or retaliation,

1  complain about, and/or report, being retaliated against, discriminated against and/or harassed for

2  opposing practices forbidden by FEHA.

3      81.    EMPLOYER and/or their agents/employees discriminated against and retaliated

4  against PLAINTIFFS as to the terms, conditions, and privileges of employment, and committed

5  adverse employment actions against PLAINTIFFS, as stated below, all in violation of the FEHA.

6      82.    PLAINTIFFS' coworker, Franks Sickler's, protected status under FEHA is his

7  disability.  Frank Sickler's disability was COVID-19 and PLAINTIFFS worked with him and

8  asked O'REILLY'S store manager, Tim, to provide him reasonable accommodations (allow them

9  to go home and stay home from work).

10     83.    EMPLOYER, by and through store manager, Tim, and GILMORE perceived

11 PLAINTIFFS and Frank Sickler to be disabled (COVID-19).

12     84.    PLAINTIFFS MARTINEZ'S protected status under FEHA is his association with

13 his disabled coworkers and perceived disability, perceived disability (COVID-19), seeking of

14 accommodations for his and his coworkers' disabilities, opposing practices forbidden by FEHA,

15 and engaging in protected activities (taking leave because of his exposure to COVID-19).

16     85.    PLAINTIFF HATLESTAD'S protected status under FEHA is his actual and

17 perceived disability (COVID-19 and diabetes and engaging in protected activities (requesting and

18 taking leave).

19     86.    When PLAINTIFFS opposed practices forbidden by FEHA, opposed disability

20 discrimination and harassment and engaged in protected activities, PLAINTIFFS were associated

21 with their coworkers, and when doing so, PLAINTIFFS had a protected status pursuant to FEHA.

22     87.    EMPLOYER knew, perceived, and/or believed that PLAINTIFF MARTINEZ had

23 the aforementioned protected status, described hereinabove. PLAINTIFF  MARTINEZ explicitly

24 told store manager Tim that Mr. HATLESTAD and Mr. Sickler were showing COVID-19

25 symptoms and needed to go home, and texted Tim that Mr. Sickler had tested positive for

26 COVID-19 on the same night PLAINTIFF MARTINEZ had worked with him. Before

27 PLAINTIFF MARTINEZ'S termination, EMPLOYER also became aware that Mr. HATLESTAD

28 had contracted COVID-19 and that he had worked closely with PLAINTIFF MARTINEZ.

88.    EMPLOYER knew, perceived, and/or believed that PLAINTIFF HATLESTAD had the aforementioned protected status, described hereinabove. PLAINTIFF HATLESTAD explicitly told store manager VELLIDO he was diabetic, and hence part of a vulnerable population for COVID, told VELLIDO he was ill with COVID symptoms, and told Tim and GILMORE that he had tested positive for COVID-19. Further, Mr. Martinez told Tim on two occasions that PLAINTIFF HATLESTAD was sick and was showing COVID-19 symptoms.

89.    At all times mentioned in this complaint, PLAINTIFFS could have and were able to perform work for EMPLOYER competently and in a satisfactory manner.

90.    EMPLOYER made decisions adverse to PLAINTIFFS in regards to compensation and terms, conditions and privileges of employment to include but not limited to discriminating against PLAINTIFFS, retaliating against PLAINTIFFS, terminating PLAINTIFFS, PLAINTIFFS was treated differently than employees without the same protected status as PLAINTIFFS, creating a hostile work environment towards PLAINTIFFS, failing to re-hire PLAINTIFFS, failing to employ PLAINTIFFS, failing to re-instate PLAINTIFFS, and subjecting PLAINTIFFS to different terms, conditions and privileges of employment.

91.    Due to PLAINTIFFS' protected status/association with someone with a protected status and exercise of a reasonable accommodation, EMPLOYER subjected PLAINTIFFS to discrimination and retaliation, denying PLAINTIFFS a workplace free of discrimination, and retaliation, and terminating PLAINTIFFS because of their protected class/association with a member of a protected class.

92.    PLAINTIFFS' perceived disability/association with their coworkers' disability, request for reasonable accommodations, and exercise of a reasonable accommodation, were substantial motivating factors in EMPLOYER'S aforementioned decisions that were adverse to PLAINTIFFS in regards to compensation and terms, conditions and privileges of employment.

93.    As a direct, legal, and proximate cause of PLAINTIFFS' protected status and/or association with the aforementioned protected status and request for and exercise of reasonable accommodation, EMPLOYER discriminated against PLAINTIFFS, including by terminating them.

As a direct and legal result of the acts and omissions of EMPLOYER, Plaintiffs were rendered sick, sore, lame, disabled and/or disordered, both internally and externally, and/or suffered, among other things, numerous internal injuries, severe fright, shock, pain, discomfort and/or anxiety.

94.    As a further legal result of the acts and omissions of EMPLOYER, Plaintiffs have been forced and/or will be forced to incur expenses for medical care, X-rays, and/or laboratory costs during the period of Plaintiffs's disability, and are informed and believes, and thereon allege, that they will in the future be forced to incur additional expenses of the same nature, all in an amount which is at present unknown. Plaintiffs will pray leave of court to show the exact amount of said expenses at the time of trial.

95.    As a further direct and legal result of the acts and conduct of EMPLOYER, Plaintiffs have been caused, and did suffer, and continues to suffer severe and permanent emotional and mental distress and anguish, humiliation, embarrassment, fright, shock, pain, discomfort and/or anxiety. The exact nature and extent of said injuries is presently unknown to Plaintiffs, who will pray leave of court to assert the same when they are ascertained.

96.    The aforementioned acts of EMPLOYER, and each of them, were willful, wanton, malicious, intentional, oppressive and/or despicable and were done in willful and conscious disregard of the rights, welfare and safety of Plaintiffs, and were done by officers, directors, and/or managerial agents and employees of EMPLOYER, and with the express knowledge, consent, and/or ratification of officers, directors, and/or managerial agents of EMPLOYER, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at the time of trial pursuant to California Civil Code § 3294(a) and (b).

97.    By the aforesaid acts and conduct of EMPLOYER, Plaintiffs have been directly and legally caused to suffer actual damages pursuant to California Civil Code § 3333 including, but not limited to, loss of earnings and future earning capacity, medical and related expenses for care and procedures both now and in the future, attorneys' fees, and other pecuniary loss not presently ascertained, for which Plaintiffs will seek leave of court to amend when ascertained.

98.    As a result of the acts of EMPLOYER, as alleged herein, Plaintiffs are entitled to

1  reasonable attorneys' fees and costs of said suit as specifically provided in California <u>Government</u>
2  <u>Code</u> § 12965(b).

3      99.    The FEHA also provides remedies, including but not limited to, declaratory and
4  injunctive relief. As such, Plaintiffs are entitled to both declaratory and injunctive relief as a result
5  of EMPLOYER'S unlawful conduct.

6      100.    Plaintiffs  have been damaged in an amount within the jurisdictional limits of this
7  Court.

8  **<u>SECOND CAUSE OF ACTION</u>**

9  DISABILITY RETALIATION IN VIOLATION OF FEHA

10  By Plaintiffs Against EMPLOYER and DOES 1-30

11      101.    Plaintiffs incorporate herein by reference and re-allege each and every paragraph in
12  this Complaint as though duly set forth in full herein.

13      102.    EMPLOYER employed at least five employees during all relevant time periods of
14  Plaintiffs' employment.

15      103.    Plaintiffs were, at all times material hereto, disabled employees (and one who
16  engaged in legally protected conduct) and within a protected class covered by Cal. <u>Gov. Code</u> §
17  12940.

18      104.    EMPLOYER retaliated against Plaintiff MARTINEZ as a result of (1) Plaintiffs'
19  perceived disability, (2) association with disabled coworkers; and (3) Plaintiffs asserting his
20  disabled coworkers' legal right by requesting a reasonable accommodation for their disability, and
21  by exercising his own legal rights for his perceived disability.

22      105.    EMPLOYER, retaliated against Plaintiff MARTINEZ by terminating his
23  employment, due to and substantially motivated by Plaintiff  MARTINEZ'S perceived disability;
24  association with people with a disability; requesting accommodation/protected finite leave; and/or
25  exercising his right to a reasonable accommodation/taking protected finite leave. EMPLOYER has
26  refused to rehire or reinstate PLAINTIFF MARTINEZ.

27      106.    In doing the acts alleged herein, EMPLOYER, and each of them, were substantially
28  motivated by Plaintiff MARTINEZ's perceived disability; association with people with a disability;

1  requesting accommodation/protected finite leave; and/or exercising his right to a reasonable

2  accommodation/taking protected finite leave.

3      107.    At all times relevant herein, Plaintiff MARTINEZ believes and further alleges that

4  EMPLOYER and/or its agents/representatives failed to timely, properly, and/or completely

5  investigate the retaliation Plaintiff MARTINEZ was subjected to, and instead ratified and condoned

6  the unlawful conduct.

7      108.    The acts and conduct of EMPLOYER, and each of them, as aforesaid, were in

8  violation of California Government Code §§ 12940 et seq. Said statutes impose certain duties upon

9  Defendants, and each of them, concerning retaliation against persons, such as Plaintiffs, on the basis

10  of disabilities and the prohibition of actual/perceived disability retaliation. Said statutes were

11  intended to prevent the type of injury and damage herein set forth.

12      109.    By the acts and conduct described above, EMPLOYER, and each of them, in

13  violation of said statutes, knew about, or should have known about, and failed to investigate and/or

14  properly investigate, prevent or remedy the disability retaliation. When Plaintiff MARTINEZ was

15  retaliated against, Plaintiff MARTINEZ's disability and request for associated legal rights were

16  substantial motivating reasons and/or factors in EMPLOYER'S conduct.

17      110.    EMPLOYER retaliated against Plaintiff HATLESTAD as a result of (1)

18  HATLESTAD'S actual and perceived disabilities, and (2) HATLESTAD'S request and use of a

19  reasonable accommodation.

20      111.    EMPLOYER, retaliated against HATLESTAD by terminating his employment, due

21  to and substantially motivated by HATLESTAD'S actual and perceived disabilities; requesting

22  accommodation/protected finite leave; and/or exercising his right to a reasonable

23  accommodation/taking protected finite leave. EMPLOYER has refused to rehire or reinstate

24  HATLESTAD.

25      112.    In doing the acts alleged herein, EMPLOYER, and each of them, were substantially

26  motivated by HATLESTAD'S perceived disabilities; association with people with a disability;

27  requesting accommodation/protected finite leave; and/or exercising his right to a reasonable

28  accommodation/taking protected finite leave.

113.    At all times relevant herein, Plaintiff believes and further allege that EMPLOYER and/or its agents/representatives failed to timely, properly, and/or completely investigate the retaliation HATLESTAD was subjected to, and instead ratified and condoned the unlawful conduct.

114.    The acts and conduct of EMPLOYER, and each of them, as aforesaid, were in violation of California Government Code §§ 12940 et seq. Said statutes impose certain duties upon Defendants, and each of them, concerning retaliation against persons, such as HATLESTAD, on the basis of disabilities and the prohibition of actual/perceived disability retaliation. Said statutes were intended to prevent the type of injury and damage herein set forth.

115.    By the acts and conduct described above, EMPLOYER, and each of them, in violation of said statutes, knew about, or should have known about, and failed to investigate and/or properly investigate, prevent or remedy the disability retaliation. When HATLESTAD was retaliated against, HATLESTAD'S disability and request for associated legal rights were substantial motivating reasons and/or factors in EMPLOYER'S conduct.

116.    As a direct and legal result of the acts and omissions of EMPLOYER, Plaintiffs were rendered sick, sore, lame, disabled and/or disordered, both internally and externally, and/or suffered, among other things, numerous internal injuries, severe fright, shock, pain, discomfort and/or anxiety.

117.    As a further legal result of the acts and omissions of EMPLOYER, Plaintiffs have been forced and/or will be forced to incur expenses for medical care, X-rays, and/or laboratory costs during the period of Plaintiffs's disability, and is informed and believes, and thereon alleges, that they will in the future be forced to incur additional expenses of the same nature, all in an amount which is at present unknown. Plaintiffs will pray leave of court to show the exact amount of said expenses at the time of trial.

118.    As a further direct and legal result of the acts and conduct of EMPLOYER, Plaintiffs have been caused, and did suffer, and continues to suffer severe and permanent emotional and mental distress and anguish, humiliation, embarrassment, fright, shock, pain, discomfort and/or anxiety. The exact nature and extent of said injuries is presently unknown to Plaintiffs, who will pray leave of court to assert the same when they are ascertained.

119.    The aforementioned acts of EMPLOYER, and each of them, were willful, wanton, malicious, intentional, oppressive and/or despicable and were done in willful and conscious disregard of the rights, welfare and safety of Plaintiffs, and were done by officers, directors, and/or managerial agents and employees of EMPLOYER, and with the express knowledge, consent, and/or ratification of officers, directors, and/or managerial agents of EMPLOYER, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at the time of trial pursuant to California Civil Code § 3294(a) and (b).

120.    By the aforesaid acts and conduct of EMPLOYER, Plaintiffs have been directly and legally caused to suffer actual damages pursuant to California Civil Code § 3333 including, but not limited to, loss of earnings and future earning capacity, medical and related expenses for care and procedures both now and in the future, attorneys' fees, and other pecuniary loss not presently ascertained, for which Plaintiffs will seek leave of court to amend when ascertained.

121.    As a result of the acts of EMPLOYER, as alleged herein, Plaintiffs are entitled to reasonable attorneys' fees and costs of said suit as specifically provided in California Government Code § 12965(b).

122.    The FEHA also provides remedies, including but not limited to, declaratory and injunctive relief. As such, Plaintiffs are entitled to both declaratory and injunctive relief as a result of EMPLOYER'S unlawful conduct.

123.    Plaintiffs have been damaged in an amount within the jurisdictional limits of this Court.

**THIRD CAUSE OF ACTION**

FAILURE TO PREVENT DISCRIMINATION AND RETALIATION IN VIOLATION OF

FEHA

By Plaintiffs Against EMPLOYER and DOES 1-30

124.    Plaintiffs incorporate herein by reference and re-allege each and every paragraph in this Complaint as though duly set forth in full herein.

125.    Under FEHA it is an unlawful practice for employers, labor organizations, and employment agencies to fail to maintain and preserve any and all applications, personnel,

membership, or employment referral records and files for a minimum period of two years after the records and files are initially created or received, or for employers to fail to retain personnel files of applicants or terminated employees for a minimum period of two years after the date of the employment action taken.  Additionally, upon notice that a complaint against it has been filed with the Department of Fair Employment and Housing, any such employer, labor organization, or employment agency shall maintain and preserve any and all records and files until the complaint is fully and finally disposed of and all appeals or related proceedings terminated.

126.    Under FEHA all personnel or other employment records made or kept by any employer or other covered entity dealing with any employment practice and affecting any employment benefit of any applicant or employee (including all applications, personnel, membership or employment referral records or files) shall be preserved by the employer for a period of two years from the date of the making of the record or the date of the personnel action involved such as a termination, whichever occurs later.

127.    Under the Fair Employment and Housing Act ("FEHA"), Government Code section 12940 et. seq., it is an unlawful employment practice for an employer to fail to take all reasonable steps necessary to prevent discrimination, harassment and retaliation from occurring.  It is unlawful, under FEHA to aid, abet, incite, compel, or coerce the doing of any acts forbidden under FEHA, and/or attempt to do so.

128.    It is unlawful, under the Fair Employment and Housing Act ("FEHA"), Government Code section 12900 et seq., for an employer to fail to take immediate and appropriate corrective action to end unlawful discrimination.

129.    It is unlawful, under the Fair Employment and Housing Act ("FEHA"), Government Code section 12900 et seq., for an employer to fail to investigate a complaint by an employee regarding FEHA violations as stated above.

130.    EMPLOYER failed to train its managers, including GILMORE, VELLIDO, and Tim, supervisors, and/or human resource employees, of their duties and responsibilities under FEHA as stated above.

131.    EMPLOYER failed to comply with its duties and responsibilities pursuant to FEHA

1   and related regulations as stated above.

2       132.   EMPLOYER knew and/or should have known of the aforementioned unlawful

3   retaliatory and/or discriminatory conduct, described hereinabove, all in violation of FEHA.

4       133.   EMPLOYER failed to take all reasonable steps necessary to prevent discrimination

5   and retaliation from occurring to Plaintiffs, all in violation of FEHA.

6       134.   EMPLOYER failed to investigate FEHA violations when it knew or should have

7   known they were occurring, all in violation of FEHA.

8       135.   EMPLOYER failed to maintain all employment records related to Plaintiffs for two

9   years after his termination and/or after EMPLOYER was notified Plaintiffs had filed a complaint

10  against EMPLOYER with the Department of Fair Employment and Housing, and the failure to

11  maintain records was all in violation of FEHA.

12      136.   As a direct, foreseeable, and proximate result of EMPLOYER's conduct, as alleged

13  above, Plaintiffs have suffered lost income, employment, and career opportunities, medical

14  expenses and has suffered and continues to suffer other economic loss, the precise amount of which

15  will be proven at trial.

16      137.   As a direct, foreseeable and proximate result of EMPLOYER's conduct, as alleged

17  above, Plaintiffs have suffered and continues to suffer pain and suffering, great anxiety,

18  embarrassment, anger, loss of enjoyment of life, pain and suffering, and severe emotional distress,

19  the precise amount of which will be proven at trial.

20      138.   As a direct, foreseeable and proximate result of EMPLOYER s conduct, as alleged

21  above, Plaintiffs have been damaged because he will not have records and evidence that Employer

22  had a duty to maintain, and/or had a duty to create, which would have supported Plaintiffs' claims

23  as stated above, and would have been evidence at the trial in this matter.

24      139.   As a direct and legal result of the acts and omissions of EMPLOYER, Plaintiffs were

25  rendered sick, sore, lame, disabled and/or disordered, both internally and externally, and/or suffered,

26  among other things, numerous internal injuries, severe fright, shock, pain, discomfort and/or

27  anxiety.

28      140.   As a further legal result of the acts and omissions of EMPLOYER, Plaintiffs have

1  been forced and/or will be forced to incur expenses for medical care, X-rays, and/or laboratory costs

2  during the period of Plaintiffs' disability, and is informed and believes, and thereon alleges, that

3  they will in the future be forced to incur additional expenses of the same nature, all in an amount

4  which is at present unknown. Plaintiffs will pray leave of court to show the exact amount of said

5  expenses at the time of trial.

6      141.    As a further direct and legal result of the acts and conduct of EMPLOYER, Plaintiffs

7  have been caused, and did suffer, and continues to suffer severe and permanent emotional and

8  mental distress and anguish, humiliation, embarrassment, fright, shock, pain, discomfort and/or

9  anxiety. The exact nature and extent of said injuries is presently unknown to Plaintiffs, who will

10  pray leave of court to assert the same when they are ascertained.

11      142.    The aforementioned acts of EMPLOYER, and each of them, were willful, wanton,

12  malicious, intentional, oppressive and/or despicable and were done in willful and conscious

13  disregard of the rights, welfare and safety of Plaintiffs, and were done by officers, directors, and/or

14  managerial agents and employees of EMPLOYER, and with the express knowledge, consent, and/or

15  ratification of officers, directors, and/or managerial agents of EMPLOYER, thereby justifying the

16  awarding of punitive and exemplary damages in an amount to be determined at the time of trial

17  pursuant to California Civil Code § 3294(a) and (b).

18      143.    By the aforesaid acts and conduct of EMPLOYER, Plaintiffs have been directly and

19  legally caused to suffer actual damages pursuant to California Civil Code § 3333 including, but not

20  limited to, loss of earnings and future earning capacity, medical and related expenses for care and

21  procedures both now and in the future, attorneys' fees, and other pecuniary loss not presently

22  ascertained, for which Plaintiffs will seek leave of court to amend when ascertained.

23      144.    As a result of the acts of EMPLOYER, as alleged herein, Plaintiffs are entitled to

24  reasonable attorneys' fees and costs of said suit as specifically provided in California Government

25  Code § 12965(b).

26      145.    The FEHA also provides remedies, including but not limited to, declaratory and

27  injunctive relief. As such, Plaintiffs are entitled to both declaratory and injunctive relief as a result

28  of EMPLOYER'S unlawful conduct.

1    146.    Plaintiffs have been damaged in an amount within the jurisdictional limits of this

2    Court.

**FOURTH CAUSE OF ACTION**

RETALIATION/WONGRUL TERMINATION IN VIOLATION OF PUBLIC POLICY

By PLAINTIFFS Against EMPLOYER and Does 1-30

6    147.    PLAINTIFFS incorporate herein by reference and re-allege each and every paragraph

7    in this Complaint as though duly set forth in full herein.

8    148.    At all times herein mentioned, the public policy of the State of California, as codified,

9    expressed and mandated by California <u>Government Code</u> §§ 12920 and 12940 et seq., was to prohibit

10   employers from:

11           (a)    Harassing, discriminating, and retaliating against and/or wrongfully

12                  terminating any individual on the grounds of their actual/perceived disability,

13                  or association with individuals within that protected class or characteristic, or

14                  for using or requesting a reasonable accommodation for a disability.

15   This public policy of the State of California is designed to protect all employees and to promote the

16   welfare and well-being of the community at large. The policy inures to the benefit of the public and

17   is fundamental and substantial.

18   149.    At all times herein mentioned, the public policy of the State of California, as codified,

19   expressed and mandated by California <u>Labor Code</u> section 6409.6(f) was to prohibit employers,

20   including EMPLOYER, from retaliating against a worker for disclosing a positive COVID-19 test

21   or diagnosis or order to quarantine or isolate. This public policy of the State of California is designed

22   to protect all employees and to promote the welfare and well-being of the community at large. The

23   policy inures to the benefit of the public and is fundamental and substantial.

24   150.    At all times herein mentioned, the public policy of the State of California, as codified,

25   expressed and mandated by California <u>Labor Code</u> section 248.2 was to mandate employers,

26   including EMPLOYER, to provide up to 80 hours' worth of supplemental paid sick leave to

27   employees needing to quarantine or isolate due to experiencing symptoms related to COVID-19 and

28   seeking medical diagnosis, or advised by a health care provider to self-quarantine due to concerns

related to COVID-19, among other things. This public policy of the State of California is designed to protect all employees and to promote the welfare and well-being of the community at large. The policy inures to the benefit of the public and is fundamental and substantial.

151.    At all times herein mentioned, the public policy of the State of California, as codified, expressed and mandated by California <u>Labor Code</u> section 246.5 was to prohibit employers, including EMPLOYER, from discharging or discriminating against an employee for using accrued sick days or attempting to exercise the right to use accrued sick days. This public policy of the State of California is designed to protect all employees and to promote the welfare and well-being of the community at large. The policy inures to the benefit of the public and is fundamental and substantial.

152.    At all times herein mentioned, the public policy of the State of California, as codified, expressed and mandated by <u>California Occupational Safety and Health Regulations ("Cal/OSHA")</u> section 3205(c) was to mandate employers to:

Establish, implement, and maintain an effective, written COVID-19 Prevention Program, which may be integrated into the employer's Injury and Illness Prevention Program required by section 3203, or be maintained in a separate document. The written elements of a COVID-19 Prevention Program shall include:

(1) System for communicating. The employer shall do all of the following in a form readily understandable by employees:

(A) Ask employees to report to the employer, without fear of reprisal, COVID-19 symptoms, possible close contacts, and possible COVID-19 hazards at the workplace.

(B) Describe how employees with medical or other conditions that put them at increased risk of severe COVID-19 illness can request accommodations.

(C) Provide information about access to COVID-19 testing as described in subsection (c)(5)(I) when testing is required under this section, section 3205.1, or section 3205.2.

(D) In accordance with subsection (c)(3)(B), communicate information about COVID-19 hazards and the employer's COVID-19 policies and procedures to employees and to other employers, persons, and entities within or in contact with the employer's workplace.

(2) Identification and evaluation of COVID-19 hazards.

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES

(A) The employer shall allow for employee and authorized employee representative participation in the identification and evaluation of COVID-19 hazards.

(B) The employer shall develop and implement a process for screening employees for and responding to employees with COVID-19 symptoms. The employer may ask employees to evaluate their own symptoms before reporting to work. If the employer conducts screening indoors at the workplace, the employer shall ensure that face coverings are used during screening by both screeners and employees who are not fully vaccinated and, if temperatures are measured, that non-contact thermometers are used.

(C) The employer shall develop COVID-19 policies and procedures to respond effectively and immediately to individuals at the workplace who are a COVID-19 case to prevent or reduce the risk of transmission of COVID-19 in the workplace.

(D) The employer shall conduct a workplace-specific identification of all interactions, areas, activities, processes, equipment, and materials that could potentially expose employees to COVID-19 hazards. Employers shall treat all persons, regardless of symptoms or negative COVID-19 test results, as potentially infectious.

…

(9) Exclusion of COVID-19 cases and employees who had a close contact. The purpose of this subsection is to limit transmission of COVID-19 in the workplace.

(A) Employers shall ensure that COVID-19 cases are excluded from the workplace until the return to work requirements of subsection (c)(10) are met.

(B) Employers shall exclude from the workplace employees who had a close contact until the return to work requirements of subsection (c)(10) are met, with the following exceptions:

1. Employees who were fully vaccinated before the close contact and who do not develop COVID-19 symptoms; and

2. COVID-19 cases who returned to work pursuant to subsection (c)(10)(A) or (B) and have remained free of COVID-19 symptoms, for 90 days after the initial onset of COVID-19 symptoms or, for COVID-19 cases who never developed COVID-19 symptoms, for 90 days after the first positive test.

(C) For employees excluded from work under subsection (c)(9), employers shall continue and maintain an employee's earnings, wages, seniority, and all other employee rights and benefits, including the employee's right to their former job status, as if the employee had not been removed from their job. Employers may use employer-provided employee sick leave for this purpose to the extent permitted by law. Wages due under this subsection are subject to existing wage payment obligations and must be paid at the employee's regular rate of pay no later than the regular pay day for the pay period(s) in which the employee is

excluded. Unpaid wages owed under this subsection are subject to enforcement through procedures available in existing law. If an employer determines that one of the exceptions below applies, it shall inform the employee of the denial and the applicable exception.

EXCEPTION 1: Subsection (c)(9)(C) does not apply where the employee received disability payments or was covered by workers' compensation and received temporary disability.

EXCEPTION 2: Subsection (c)(9)(C) does not apply where the employer demonstrates that the close contact is not work related.

(D) Subsection (c)(9) does not limit any other applicable law, employer policy, or collective bargaining agreement that provides for greater protections.

(E) At the time of exclusion, the employer shall provide the employee the information on benefits described in subsections (c)(5)(B) and (c)(9)(C).

(10) Return to work criteria.

(A) COVID-19 cases with COVID-19 symptoms shall not return to work until:

1. At least 24 hours have passed since a fever of 100.4 degrees Fahrenheit or higher has resolved without the use of fever-reducing medications; and

2. COVID-19 symptoms have improved; and

3. At least 10 days have passed since COVID-19 symptoms first appeared.

(B) COVID-19 cases who tested positive but never developed COVID-19 symptoms shall not return to work until a minimum of 10 days have passed since the date of specimen collection of their first positive COVID-19 test.

(D) Once a COVID-19 case has met the requirements of subsection (c)(10)(A) or

(B), as applicable, a negative COVID-19 test shall not be required for an employee to return to work.

(E) Persons who had a close contact may return to work as follows:

1. Persons who had a close contact but never developed any COVID-19 symptoms may return to work when 10 days have passed since the last known close contact.

2. Persons who had a close contact and developed any COVID-19 symptom cannot return to work until the requirements of subsection (c)(10)(A) have been met, unless all of the following are true:

a. The person tested negative for COVID-19 using a polymerase chain reaction (PCR) COVID-19 test with specimen taken after the onset of symptoms; and

b. At least 10 days have passed since the last known close contact; and

c. The person has been symptom-free for at least 24 hours, without using fever-reducing medications.

…

(E) If an order to isolate, quarantine, or exclude an employee is issued by a local or state health official, the employee shall not return to work until the period of isolation or quarantine is completed or the order is lifted. If no period was specified, then the period shall be in accordance with the return to work periods in subsection (c)(10)(A), (c)(10)(B), or (c)(10)(D), as applicable.

This public policy of the State of California is designed to protect all employees and to promote the welfare and well-being of the community at large. The policy inures to the benefit of the public and is fundamental and substantial.

153.    At all times herein mentioned, the public policy of the State of California, as codified, expressed and mandated by <u>California Occupational Safety and Health Regulations ("Cal/OSHA")</u> section 3205.1(d) was to mandate employers to do the following if three or more employee COVID-19 cases within an exposed group, as defined by section 3205(b) visited the workplace during their high-risk exposure period at any time during a 14-day period until there are no new COVID-19 cases detected in the exposed group for a 14-day period:

(b) COVID-19 testing.

(1) The employer shall make COVID-19 testing available at no cost to its employees within the exposed group, during employees' paid time, except:

(A) Employees who were not present at the workplace during the relevant 14-day period(s) under subsection (a).

(B) Employees who were fully vaccinated before section 3205.1 became applicable to the workplace and who do not have COVID-19 symptoms.

(C) For COVID-19 cases who did not develop COVID-19 symptoms after returning to work pursuant to subsections 3205(c)(10)(A) or (B), no testing is required for 90 days after the initial onset of COVID-19 symptoms or, for COVID-19 cases who never developed symptoms, 90 days after the first positive test.

(2) COVID-19 testing shall consist of the following:

(A) Immediately upon being covered by this section, testing shall be made available to all employees in the exposed group and then again one week later. Negative COVID-19 test results of employees with COVID-19 exposure shall not impact

the duration of any quarantine, isolation, or exclusion period required by, or orders issued by, the local health department.

(B) After the first two COVID-19 tests required by subsection (b)(2)(A), employers shall make COVID-19 testing available once a week at no cost, during paid time, to all employees in the exposed group who remain at the workplace, or more frequently if recommended by the local health department, until this section no longer applies pursuant to subsection (a)(2).

(b)    Employers shall make additional testing available at no cost to employees, during employees' paid time, when deemed necessary by the Division through the Issuance of Order to Take Special Action, in accordance with title 8, section 332.3.

(c)    The employer shall continue to comply with all applicable provisions of section 3205, and shall also do the following:

(1) Employees in the exposed group shall wear face coverings when indoors, or when outdoors and less than six feet from another person, unless one of the exceptions in subsection 3205(c)(6)(D) applies.

(2) Employers shall give notice to employees in the exposed group of their right to request a respirator for voluntary use under subsection 3205(c)(7)(D)2., if they are not fully vaccinated.
(3) Employers shall evaluate whether to implement physical distancing of at least six feet between persons or, where six feet of physical distancing is not feasible, the use of cleanable solid partitions of sufficient size to reduce COVID-19 transmission.

(d)    COVID-19 Investigation, review and hazard correction. The employer shall immediately perform a review of potentially relevant COVID-19 policies, procedures, and controls and implement changes as needed to prevent further spread of COVID-19. The investigation and review shall be documented and include:

(1) Investigation of new or unabated COVID-19 hazards including the employer's leave policies and practices and whether employees are discouraged from remaining home when sick; the employer's COVID-19 testing policies; insufficient outdoor air; insufficient air filtration; and lack of physical distancing.

(2) The review shall be updated every 30 days that this section continues to apply, in response to new information or to new or previously unrecognized COVID-19 hazards, or when otherwise necessary.

(3) The employer shall implement changes to reduce the transmission of COVID-19 based on the investigation and review required by subsections (e)(1) and (e)(2). The employer shall consider moving indoor tasks outdoors or having them performed remotely, increasing outdoor air supply when work is done indoors, improving air filtration, increasing physical distancing as much as feasible, requiring respiratory protection in compliance with section 5144, and other applicable controls.

1

2

3

4

5

(f) In buildings or structures with mechanical ventilation, employers shall filter recirculated air with Minimum Efficiency Reporting Value (MERV) 13 or higher efficiency filters if compatible with the ventilation system. If MERV-13 or higher filters are not compatible with the ventilation system, employers shall use filters with the highest compatible filtering efficiency. Employers shall also evaluate whether portable or mounted High Efficiency Particulate Air (HEPA) filtration units or other air cleaning systems would reduce the risk of transmission and, if so, shall implement their use to the degree feasible.

6

7

This public policy of the State of California is designed to protect all employees and to promote the welfare and well-being of the community at large. The policy inures to the benefit of the public and is fundamental and substantial.

8

9

10

154.    The FEHA, Labor Codes, and CalOSHA regulations, as stated above, constitute and embody fundamental, substantial, and well-established California public policy.  Accordingly, when employees assert rights under the FEHA, Labor Codes, and CalOSHA, and their complimentary regulations, the employee has a protected status pursuant to the FEHA, the Labor Codes, and CalOSHA, and also California public policy.

11

12

13

14

15

155.    Therefore, because EMPLOYER made decisions adverse to PLAINTIFFS in regards to compensation and terms, conditions and privileges of employment, including but not limited to, discriminating against PLAINTIFFS, retaliating against PLAINTIFFS, terminating PLAINTIFFS all because of (1) PLAINTIFFS' actual and/or perceived disability; (2) association with a disability; (3) quarantining/isolating due to exposure to COVID-19 and symptoms as a result of DEFENDANTS' willful an intentional violations of all the provisions contained in (a) Labor Code sections 248.2 and 6409.6, and (b) Cal/OSHA sections 3205 and 3205.1, provided above; (4) using accrued, state-mandated sick time; requesting and/or using a reasonable accommodation for their actual or perceived disability,  EMPLOYER'S decisions adverse to PLAINTIFFS were wrongful and violated California and federal public policy.

16

17

18

19

20

21

22

23

24

25

156.    Therefore, because EMPLOYER made decisions adverse to PLAINTIFFS in regards to compensation and terms, conditions and privileges of employment, substantially motivated by the reasons above, EMPLOYER'S decisions adverse to PLAINTIFFS were wrongful and violated California public policy. The adverse actions of EMPLOYER, including the wrongful termination

26

27

28

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES

of PLAINTIFFS, on the grounds alleged and described herein, were wrongful, in violation of public policy, and hinder the welfare and well-being of the community at large.

157.    As a direct, foreseeable, and proximate result of EMPLOYER'S conduct, as alleged above, PLAINTIFFS have suffered lost income and benefits, incurred medical expenses, and lost career opportunities, and have suffered and continues to suffer other economic loss, the precise amount of which will be proven at trial.

158.    As a direct, foreseeable and proximate result of EMPLOYER'S conduct, as alleged above, PLAINTIFFS have suffered and continues to suffer great anxiety, embarrassment, anger, loss of enjoyment of life, pain and suffering, and severe emotional distress, the precise amount of which will be proven at trial.

159.    The conduct which PLAINTIFFS complains of in this complaint, and which is alleged above, was carried out by the EMPLOYE willfully, intentionally, and with oppression, malice and fraud and was carried out with conscious disregard of PLAINTIFFS'S rights as and as such PLAINTIFFS are entitled to an award of exemplary damages according to proof.   The aforementioned conducted on which punitive damages is alleged, as described hereinabove, was done with the advance knowledge by an officer, director and/or managing agent of EMPLOYER, of the unfitness of the employee, and the employee was employed with a conscious disregard of the rights and/or safety or others. The aforementioned conducted on which punitive damages is alleged, as described hereinabove, was authorized, ratified and/or committed by an officer, director, and/or managing agent of EMPLOYER.

160.    PLAINTIFFS had to employ an attorney to prosecute this action and has thereby incurred costs and attorney fees.  Such attorneys' fees and costs are necessary for the prosecution of this action for which PLAINTIFFS are entitled to an award of attorneys' fees and costs in an amount according to proof, including pursuant to CCP § 1021.5 et. seq. and Government Code section 12965.

161.    PLAINTIFFS seek declaratory relief that PLAINTIFFS'S rights under the public policy were violated, that EMPLOYER violated the public policy, that training and education of EMPLOYER needs to occur in order for it to comply with the public policy, and other forms of

1  declaratory relief.

2      162.    PLAINTIFFS seek injunctive and/or declaratory relief and any other remedies they

3  are entitled to under the law pursuant to the claims alleged in this complaint.

4  **FIFTH CAUSE OF ACTION**

5  VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200, ET SEQ.

6  By Plaintiffs Against EMPLOYER and Does 1-30

7      163.    Plaintiffs incorporate herein by reference and re-allege each and every paragraph in

8  this Complaint as though duly set forth in full herein.

9      164.    Plaintiffs bring this cause of action on behalf of themselves as a private attorney

10  general and on behalf of members of the general public pursuant to Section 17200 et seq., of the

11  Business and Professions Code, and the laws of equity.  The conduct of EMPLOYER engaged in as

12  alleged above has been, and continues to be, deleterious to the general public.  Plaintiffs are

13  seeking to enforce important rights affecting the public interest within the meaning of Code of

14  Civil Procedure § 1021.5, and requests injunctive and equitable relief as the Court deems

15  appropriate.

16      165.    Plaintiffs are informed and believes and on that basis, alleges that EMPLOYER and

17  DOES 1-30, and each of them, have engaged, continue to engage, and will continue to engage in a

18  pattern of unlawful and unethical conduct, as stated above, including violations of Cal/OSHA

19  sections 3205 and 3205.1, and the fraudulent, deceitful, deceptive, and abusive practices and

20  conduct, as stated above, and as to EMPLOYER'S violation, and as to violations by

21  EMPLOYER'S employees, of laws, statutes, ordinances, regulations and/or codes as stated above.

22  Further, EMPLOYER has never taken adequate measures to remedy its unlawful conduct and

23  fraudulent, deceitful, deceptive, and abusive practices and conduct, as stated above.

24      166.    EMPLOYER knew or reasonably should have known that its employees,

25  supervisors, and managers, engaged in unlawful, fraudulent, deceitful, and/or abusive, conduct as

26  stated above, and failed to do anything to prevent the conduct and practices, and instead retaliated

27  against Plaintiffs for exercising their rights under the law.

28

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES

167.    EMPLOYER violated the public policies contained in numerous statutes, codes, regulations, and ordinances, as stated above, and EMPLOYER failed to remedy the violations.

168.    All EMPLOYER'S employees who failed to act to comply with the law and prevent the unlawful, fraudulent, deceitful, and/or abusive, conduct as stated above, without proper training will continue to do so.

169.    EMPLOYER'S actions and failures to act, as described above, constitute an ongoing and continuous unfair business practice, and unless restrained from doing so, EMPLOYER will continue to engage in said unfair business practices and/or fail to remedy conditions creating unfair business practices.  Thus, EMPLOYER'S conduct and practices will continue to harm and damage the general public.

170.    EMPLOYER'S business practices as stated above, injured and harmed the general public, including PLAINTIFFS, and will continue to cause injury to the general public who has no adequate remedy at law.   Relief for damages alone for EMPLOYER'S continuing unlawful business practices would require a multiplicity of lawsuits.

171.    As a direct, foreseeable and proximate result of EMPLOYER'S conduct, as alleged above, damages will continue to the general public without appropriate injunctive and equitable relief.

172.    Plaintiffs request that EMPLOYER be ordered to comply with all provisions of the laws which PLAINTIFFS allege it has and continues to violate, and  be enjoined from operating at the facility where Plaintiffs were employed until its employees receive the necessary training, and EMPLOYER has offered sufficient guarantees, which will result in the cessation of the unlawful, fraudulent, unethical, deceitful, and/or abusive, conduct as stated above.

173.    Plaintiffs request damages and/or restitution of all monies and profits from its unfair business practices to be disgorged from EMPLOYER and returned to affected parties, including PLAINTIFFS.

174.    Plaintiffs have had to employ an attorney to prosecute this action and has thereby incurred costs and attorney fees.  Such attorneys' fees and costs are necessary for the prosecution of

1  this action for which Plaintiffs are entitled to an award of attorneys' fees and costs in an amount

2  according to proof pursuant to C.C.P. § 1021.5 and/or the private attorney general doctrine.

3  **PRAYER FOR RELIEF**

4  PLAINTIFFS seek judgment against EMPLOYER and Does 1-30 as follows:

5  1.    For special damages, including actual, consequential and incidental losses including,

6      but not limited to, unpaid wages, medical bills, past, present and future loss of

7      earnings and benefits, front-pay and benefits, back pay and benefits, all according to

8      proof, all together with prejudgment interest;

9  2.    For general damages according to proof;

10  3.    For all punitive damages against each defendant in an amount deemed proper by this

11      court;

12  4.    For restitution pursuant to Business and Professions Code section 17200, et seq.;

13  5.    For reasonable attorneys' fees;

14  6.    For costs of suit; and

15  7.    For such other and further relief as this Court deems proper.

16

17  Dated:  March 6, 2023                    **THE RAMIREZ LEGAL GROUP**

18

19                         By: _____

20                             APRIL RAMIREZ, ESQ.
                              Attorneys for Plaintiffs,
21                             NICOLAS   MARTINEZ   &   THEODORE
                              HATLESTAD
22

23

24

25

26

27

28

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES

1

**DEMAND FOR JURY TRIAL**

2      PLAINTIFFS hereby demand a trial by jury on all causes of action.

3

4   Dated: March 6, 2023                **THE RAMIREZ LEGAL GROUP**

5

6                                By: _____

7                                    APRIL RAMIREZ, ESQ.
                                     Attorneys for Plaintiffs,
8                                    NICOLAS    MARTINEZ    &    THEODORE
                                     HATLESTAD
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES

## PROOF OF SERVICE

1

2      I am employed in the County of Los Angeles, State of California. I am over the age of 18

3  and not a party to the within action. My business address is 468 N. Camden Dr., Beverly Hills,
   California 90210.

4      On March 6, 2023, I served the within document(s) described as:

5  **PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES**

6      on the interested parties in this action as stated on the attached mailing list.

7   ☒   (BY MAIL) By placing a true copy of the foregoing document(s) in a sealed envelope
        addressed as set forth on the attached mailing list.  I placed each such envelope for

8       collection and mailing following ordinary business practices.  I am readily familiar with this
        Firm's practice for collection and processing of correspondence for mailing.  Under that

9       practice, the correspondence would be deposited with the United States Postal Service on
        that same day, with postage thereon fully prepaid at Los Angeles, California, in the ordinary

10      course of business.

11  ☐   (BY OVERNIGHT DELIVERY) I deposited in a box or other facility regularly maintained
        by Federal Express, an express service carrier, or delivered to a courier or driver authorized

12      by said express service carrier to receive documents, a true copy of the foregoing
        document(s) in a sealed envelope or package designated by the express service carrier,

13      addressed as set forth on the attached mailing list, with fees for overnight delivery paid or
        provided for.

14

15  ☐   (ONLY BY ELECTRONIC TRANSMISSION) Only by e-mailing the document(s) to the
        persons at the e-mail address(es) listed based on adequate notice previously provided and

16      obtained. No electronic message or other indication that the transmission was unsuccessful
        was received within a reasonable time after the transmission. We will provide a physical

17      copy upon request only.

18  ☐   (BY PERSONAL SERVICE) I personally served all parties on the attached service list.

19      Executed on March 6, 2023, at Los Angeles, California.

20      I declare under penalty of perjury under the laws of the State of California that the
   foregoing is true and correct.

21

22  _____          _____

           Josmar Tello                          (Signature)

23

24

25

26

27

28

1

*Nicolas Martinez; Theodore Hatlestad V. O'Reilly Auto Enterprises LLC*

**CASE NO. 1:22-cv-01643-ADA-CDB**

**TRLG Client:   Nicolas Martinez & Theodore Hatlestad**

**SERVICE LIST**

Geoffrey M. Thorne, Esq.
James M. Peterson, Esq.
Higgs Fletcher & Mack, LLP
401 West A Street
Suite 2600
San Diego, CA 92101

Email: thorneg@higgslaw.com
Email: peterson@higgslaw.com

Counsel for Defendants, *O'Reilly Auto*
*Enterprises LLC*
*(Consented to mail service)*

2